IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARK BARTLETT, | ) |
|       Plaintiff, | ) ) ) |
| v. | )   Case No. |
| JAMES BARTLETT, DENISE BARTLETT, EVAN BARTLETT, ANOOSH MOTAMEDI, and MARK KEENAN, | ) ) ) ) ) |
|       Defendants. | ) |

## COMPLAINT

Plaintiff Mark Bartlett ("Mr. Bartlett"), by his attorneys, Steven N. Malitz, Christopher S. Naveja, and Joseph L. Hoolihan of Arnstein & Lehr LLP, *of counsel*, complains against Defendants James Bartlett ("Jim"), Denise Bartlett ("Denise"), Evan Bartlett ("Evan"), Anoosh Motamedi ("Anoosh"), and Mark Keenan ("Keenan"), as follows:

## INTRODUCTION

1. For over 13 years, brothers Mark and Jim Bartlett jointly owned cash lending stores and split profits equally. Beginning in 2014, however, Jim orchestrated a clandestine scheme to deprive Mark of the value of his interest in four of the lending stores Mark and Jim owned.

2. Jim, with the help of his wife Denise, his son Evan, and his "right-hand man" Anoosh, organized a company named Dellano to own and operate a new loan business they called AAA Quick Cash Advance ("Quick Cash").

3. Jim charged Anoosh and Keenan, both employees at the stores that Mark and Jim jointly-owned, to manage day-to-day operations of Quick Cash.

4. At Jim's direction, Denise, Anoosh, and Evan incorporated three entities, listing themselves as owners. Jim, Denise, Anoosh and Evan then funneled Jim's money through those entities to Dellano and Quick Cash, effectively hiding Jim's *de facto* ownership in Dellano.

5. Despite appearances, all Quick Cash profits ultimately flowed to Jim.

6. Once the new entities had been organized, Jim, Anoosh, and Keenan began siphoning money, resources, customers, and profits from the stores Jim and Mark jointly owned, to Jim's new Quick Cash stores. This crippled Mark and Jim's business, while bolstering Quick Cash.

7. To date, Jim, with the help of his wife, his son, Anoosh, and Keenan has expropriated over $750,000 from Mark and Jim's jointly-owned stores. Jim plans to continue plundering the lending stores that he and Mark jointly own until they have been completely looted.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 because this case arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 through § 1968.

9. Venue is proper in the Northern District of Illinois pursuant to 18 U.S.C. § 1965 because Jim owns Loan Stores and an internet lending company in this district, lends to customers who reside in this district, and has employees in this district.

10. Personal jurisdiction is proper in Illinois because all defendants have the required minimum contacts with the United States. *See Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668, 671 (7th Cir. 1987).

## PARTIES TO THIS ACTION

11. Mark is an individual who resides in Florida.

12. Jim is an individual who resides in Florida, but maintains a home and business headquarters in Illinois.

13. Denise is an individual who resides in Florida, but maintains a home in Illinois.

14. Anoosh is an individual who resides in Illinois.

15. Evan is an individual who resides in Illinois.

16. Keenan is an individual who resides in Illinois (Jim, Denise, Anoosh, Evan, and Keenan are collectively referred to as the "co-conspirators").

## OTHER PARTIES INVOLVED IN THIS ACTION

17. Mark and Jim, through four business entities, jointly own nine cash lending stores, four of which are in New Mexico and managed by Jim. See Demonstrative Chart attached as **Exhibit A**.

18. American Cash Loans, LLC ("American") is one of the entities jointly owned by Mark and Jim with three loan stores in New Mexico. See **Ex. A**.

19. Jim is the Manager of American. See **Ex. A**.

20. The American loan stores are located in Albuquerque, New Mexico; Farmington, New Mexico; and Hobbs, New Mexico. See **Ex. A**.

21. B & B Investment Group, Inc. ("B&B") is an entity jointly owned by Mark and Jim. See **Ex. A**.

22. B&B owns Cash Loans Now ("Cash Loans"), which operates a loan store in Farmington, New Mexico, and is managed by Jim. See **Ex. A**.

23. Dellano, LLC ("Dellano") is a Delaware Limited Liability Company doing business as AAA Quick Cash Advance in New Mexico, where it operates loan stores. See **Ex. A**.

24. The Members of Dellano are two corporations: Blue Financial, Inc. ("Blue Financial") and The Pathway Group, Inc. ("Pathway"). See **Ex. A**.

25. Blue Financial is a Florida corporation that owns 25% of Dellano. See **Ex. A**.

26. Anoosh and the Denise E. Bartlett Revocable Trust 1-20-2007 are the shareholders, officers and directors of Blue Financial. See **Ex. A**.

27. Pathway is a Florida corporation and owns 75% of Dellano. See **Ex. A**.

28. Evan and Denise are the officers, directors and shareholders of Pathway, and Jim holds a blanket lien on the assets of Pathway. See **Ex. A**.

29. Renwel Financial, Inc. ("Renwel") is a Florida corporation, solely owned by Denise, which provided $155,000 of seed funding to Blue Financial and Pathway so those entities could capitalize Dellano and Quick Cash. See **Ex. A**. Renwel has a blanket lien on the assets of Blue Financial and Pathway. See **Ex. A**.

## FACTUAL ALLEGATIONS COMMON TO ALL RICO COUNTS

30. Mark and Jim are entrepreneurs who have been involved in the lending industry for many years.

31. In 2003, Mark and Jim opened a number of cash loan stores under their joint ownership. See **Ex. A**.

32. In 2009, they decided that Mark would be LLC Manager of five stores in Illinois and Wisconsin, while Jim would be LLC Manager of four loan stores located inside New Mexico ("New Mexico Stores"). See **Ex. A**.

33. The brothers agreed they would each receive equal fees and profits from all the loan stores, except that Mark would receive an extra $43,000 per year for managing one more store than Jim.

34. Three of the New Mexico Stores were operated under the American name, while one was operated under the B&B name. See **Ex. A**.

35. Jim operates a management company named Wellington LLC, with offices in the state of Illinois, that provides management services to the New Mexico Stores.

36. Anoosh is Vice President of Jim's companies.

37. Anoosh is Jim's second-in-command, and works out of Jim's Illinois offices.

The Scheme

38. In 2014, Jim devised a plan to cut Mark out of the profits of all the New Mexico Stores.

39. In or about September 2014, Jim directed his wife, Denise, and his Vice President Anoosh, to reinstate Dellano, LLC.

40. Dellano had formerly been a law abiding company, in good standing, owned by Denise and Anoosh, but was administratively dissolved some time before August 2014.

41. In August 2014, Anoosh electronically submitted the required information and documentation to the Delaware Secretary of State to reinstate Dellano, designating Blue Financial and Pathway as the two Members.

42. Dellano would eventually operate loan stores under the Quick Cash name, for the illicit purpose of defrauding Mark.

43. By submitting documents electronically to the Delaware Secretary of State to reinstate Dellano, Jim, Anoosh, and Denise used the interstate wires to defraud Mark, in violation of 18 U.S.C. § 1343.

44. Blue Financial holds a 25% interest in Dellano.

45. Pathway holds a 75% interest in Dellano.

46. The co-conspirators planned for Quick Cash to open loan stores within very close proximity of Mark and Jim's mutually owned stores, American and B&B, without Mark's knowledge or consent, in order to divert business from American and B&B to Quick Cash, effectively cutting Mark out and allowing Jim to take an increasingly larger share of Mark's money.

47. Despite his fiduciary duties to Mark, Jim concealed his plans to divert business from American and B&B to Quick Cash.

48. Jim used the funds of Mark and Jim's mutually owned companies (American and B&B) to hire and train Quick Cash employees, to build-out Quick Cash store fronts, to fund loans made by Quick Cash, and to pay monthly expenses of Quick Cash.

49. Jim hired his neighbor and business partner, Keenan, to manage all the New Mexico stores, including Quick Cash, American, and B&B, while Keenan was residing in Illinois and being paid solely by American.

50. Behind closed doors, Anoosh and Denise met at Denise and Jim Bartlett's Illinois home in or about September 2014 to incorporate Blue Financial.

51. Anoosh and Denise used Anoosh's laptop to electronically file the required documentation to incorporate Blue Financial.

52. The two designated Denise as the "incorporator" and registered agent of Blue Financial.

53. They designated Anoosh and the Denise E. Bartlett Revocable Trust 1-20-2007 as the officers and directors of Blue Financial.

54. By submitting documents electronically to the Florida Secretary of State to incorporate Blue Financial, Mark, Jim, Anoosh and Denise used the interstate wires to defraud Mark, in violation of 18 U.S.C. § 1343.

55. Around that same time in September 2014, Denise and her 23-year-old son Evan incorporated The Pathway Group, Inc., by electronically submitting the required documentation to the Secretary of State.

56. They designated Denise as the Registered Agent.

57. They designated Denise and Evan as the officers and directors of Pathway.

58. By submitting documents electronically to the Florida Secretary of State to incorporate Pathway, Evan, Denise, and Jim used the interstate wires to defraud Mark, in violation of 18 U.S.C. § 1343.

59. Evan operates Pathway under the direction of Jim and Denise, his father and mother.

60. On information and belief, Evan remits substantially all profits he receives as a shareholder of Pathway to his parents.

61. Any monetary investment Evan made in Pathway or Dellano originated from his parents.

7

62. In October 2014, with the help and direction of her husband Jim, Denise incorporated Renwel Financial, Inc., by submitting the required documentation electronically to the Secretary of State.

63. Denise designated herself as the Registered Agent of Renwel.

64. Denise designated herself as the President, and sole officer and director, of Renwel.

65. By submitting documents electronically to the Florida Secretary of State to incorporate Renwel, Denise and Jim used the interstate wires to defraud Mark, in violation of 18 U.S.C. § 1343.

66. Subsequently, Renwel made a loan of $155,000 to Blue Financial and Pathway so those entities could capitalize Dellano.

67. The $155,000 loan from Renwel came directly from Denise and Jim Bartlett's joint, personal bank account.

68. On information and belief, such transfer was made via an ACH wire transfer.

69. Such wire transfer, made as part of a scheme to defraud Mark, violated 18 U.S.C. § 1343.

70. Each act of wire fraud by the co-conspirators constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961.

71. Once Dellano was organized and funded, it began opening loan stores under the Quick Cash name.

72. Franklin Armijo ("Mr. Armijo") is a former district manager for American.

73. While employed by American, Jim directed Mr. Armijo to find a store location for Quick Cash.

74. Once Mr. Armijo found a location, Jim negotiated and executed a lease.

75. Jim further directed Mr. Armijo to apply for Quick Cash's loan license with the city, fill out and sign paperwork for Quick Cash's tax identification number, move furniture into the new Quick Cash store, and set up security cameras and utilities.

76. Jim then transferred Mike Luksan, an assistant manager at American, to be the manager of Quick Cash.

77. Jim hired an employee named "Melanie" (last name unknown) to "float" between American and Quick Cash, effectively working as an employee for both entities.

78. Melanie was paid by American, rather than Quick Cash.

79. Anoosh was the operational manager of the Quick Cash store.

80. Jim directed Keenan, an American and B&B employee, to assist Anoosh with the management of Quick Cash.

81. Keenan is paid by American rather than Quick Cash.

82. Anoosh, Jim, and Keenan told American, B&B and Quick Cash employees that Anoosh was the owner of Quick Cash.

83. At Jim's direction, Keenan and Anoosh informed American, B&B, and Quick Cash employees that Quick Cash was a "sister" store of American and B&B.

84. Neither Jim, Keenan, nor Anoosh ever told Mark that there was a "sister" store to American and B&B, stores in which Mark possessed an ownership interest.

Theft of Trade Secrets

85. The co-conspirators facilitated the transmission of, and allowed Quick Cash to steal, valuable trade secrets from American and B&B without Mark's knowledge or consent, in violation of 18 USC § 1832.

86. Quick Cash used the same borrowing and lending protocol as American and B&B.

87. Quick Cash used the same "office use form" for its loans as American and B&B.

88. Quick Cash's TILA disclosures were identical to American's.

89. Quick Cash's ACH authorization forms were identical to American's.

90. The co-conspirators made American and B&B customer lists available to Quick Cash so that Quick Cash could further poach American and B&B employees.

91. Customer lists are perhaps the most valuable piece of proprietary, trade secret information that American and B&B possess.

92. All American and B&B customer lists and other trade secret information were treated as confidential trade secrets.

93. All reasonable and necessary steps were taken to protect American and B&B customer lists and other trade secret information from improper disclosure.

94. For instance, the customer lists were kept on secure computer networks, shielded from the general public, and only provided to employees on a "need to know basis."

95. Each week, Keenan conducted telephone conference calls involving managers from American, B&B, and Quick Cash, without Mark's knowledge or consent.

96. On their weekly conference calls, the store managers discussed business strategy and financial matters without Mark's knowledge or consent, despite those stores purportedly being separate businesses, with distinct ownership.

97. American and B&B's financial information and business strategy were confidential trade secrets and were treated as such until Keenan disclosed them to Quick Cash.

98. Each individual theft of trade secrets by the co-conspirators constitutes a "racketeering activity," within the meaning of 18 U.S.C. § 1961.

The Scheme Continues

99. In late 2014, Jim began "phasing out" the American and B&B loan stores that he and Mark jointly owned.

100. Jim directed Keenan to dramatically decrease the number of loans made by American and B&B.

101. Jim and Keenan directed American and B&B employees to refer new and repeat customers to Quick Cash.

102. Without telling Mark, and against customary business practice, Jim cut off cash flow to the American and B&B stores, forcing them to make loans solely from the cash they carried on hand.

103. Jim and Keenan further directed American and B&B employees to begin prominently displaying Quick Cash business cards in American and B&B stores.

104. In early 2015, Jim began planning to expand Quick Cash, and further phase out American and B&B.

105. Jim discussed his plans with former employee, Mr. Armijo.

106. Jim told Mr. Armijo that he planned to move and consolidate the American-Farmington and B&B-Farmington stores into one, small office location that could be leased for $400-$500 per month.

107. The small office location would be dedicated solely to collecting outstanding loans those stores had previously made.

108. They would no longer accept loan applications or engage in lending services.

109. Jim told Mr. Armijo that he planned to fill the vacant store front space that the American and B&B stores had once occupied, with new Quick Cash stores.

11

110. Jim's plan would allow him to cut-out Mark completely from the two Farmington locations.

111. On information and belief, Jim similarly planned to replace the two remaining American stores with Quick Cash stores.

112. Substantially all profits made by the Quick Cash stores flow to Jim or his wife Denise, who exclusively use joint bank accounts.

113. Jim uses revenue generated by American and B&B, the stores Jim jointly owns with Mark, to pay for business expenses of Quick Cash.

114. Jim directs American and B&B stores to fund payroll for the Quick Cash stores, thereby misappropriating approximately $50,000 per year, per store.

115. Jim directs American and B&B stores to pay for office supplies of the Quick Cash stores, thereby misappropriating approximately $2,000 per year, per store.

116. Jim directs American and B&B stores to pay travel expenses for the Quick Cash stores, creating an extra expense of approximately $4,000 per year, per store.

117. Jim continues to pull money, resources, and customers from American and B&B for Quick Cash's profit and gain.

118. Jim knew he had a duty to Mark to disclose the existence of his and his wife's ownership interest in Quick Cash.

119. Nonetheless, Jim fraudulently concealed his and his wife's ownership interest from Mark.

120. Denise, Evan, Anoosh, and Keenan all knew that Mark was a co-owner of American and B&B.

121. Nonetheless, they fraudulently concealed the fact that Denise, Jim and Evan possessed ownership interests in Quick Cash.

122. Indeed, the co-conspirators continue to misrepresent to Mark that Anoosh is the sole owner of Quick Cash to this day.

123. The co-conspirators also concealed from Mark that they were referring American and B&B customers to Quick Cash, making American and B&B customer lists available to Quick Cash, using American and B&B employees for Quick Cash's benefit, and conducting joint telephone conference calls among managers for all of the entities to disclose confidential trade secret information of American and B&B.

124. If Mark had known that Jim was using Quick Cash to pilfer American and B&B customers, profits, and trade secrets, Mark would have taken immediate legal action to prevent the pilfering.

125. The co-conspirators knew that Mark would have taken action against them if he found out about their scheme, so they continued to conceal its existence.

126. Until recently, Mark had no knowledge of the co-conspirators racketeering scheme to loot the American and B&B entities.

127. With reasonable diligence, Mark could not have discovered the way in which the co-conspirators were defrauding him because Jim and the other co-conspirators managed and oversaw operations for American, B&B, and Quick Cash, and shielded all relevant damaging information from Mark.

128. Mark trusted Jim to run the American and B&B businesses, and the stores they owned, in accordance with his fiduciary duties.

129. Mark trusted the other co-conspirators, as employees who performed work for American and B&B, to perform that work in accordance with their duties.

130. The co-conspirators violated Mark's trust.

131. The co-conspirators' racketeering scheme has devastated Mark's proprietary interest in the New Mexico Stores.

132. In 2015 alone, profits from the New Mexico Stores fell $150,000 per store compared to 2014, despite improved macroeconomic conditions in the same period.

133. In aggregate, the four New Mexico Stores have lost $600,000 in profits compared to 2014, as a result of the co-conspirators racketeering activities.

134. At the same time, Jim and his co-conspirators have profited handsomely.

## COUNT I: RICO § 1962(c) – JIM BARTLETT

135. The allegations of paragraphs 1 – 134 are incorporated by reference.

136. This count is against Defendant Jim Bartlett.

137. Dellano d/b/a Quick Cash is an enterprise engaged in, and whose activities affect, interstate commerce.

138. Dellano is a Delaware corporation that owns cash loan stores in New Mexico and is managed from Illinois.

139. Furthermore, Anoosh operates Dellano from his Illinois offices.

140. Anoosh operates Dellano from the same office that he uses to conduct business as Vice President of Operations for Jim's other companies.

141. Finally, Quick Cash solicits lending services on its website to all United States citizens who possess a valid driver's license, are above the age of 18, and have an active checking or savings account.

142. The association-in-fact between the co-conspirators, utilizing the shell entities of Blue Financial, Pathway and Renwel to invest in the Dellano and Quick Cash business, is an enterprise engaged in, and whose activities affect, interstate commerce.

143. The co-conspirators reside in, and have perpetrated their racketeering scheme from, Illinois, Florida, and New Mexico.

144. Blue Financial is a Florida corporation, with a Principal Address in Edwardsville, Illinois, where it is managed and operated.

145. Blue Financial additionally invested in Dellano, a Delaware corporation that does business as Quick Cash in New Mexico.

146. Renwel is a Florida Corporation, with a principal address in Palm City, Florida, where it is managed and operated.

147. Renwel provided seed funding for Dellano, a Delaware corporation that does business as Quick Cash in New Mexico.

148. Pathway is a Florida corporation, with a principal address in Palm City, Florida.

149. Pathway is operated by Evan, who is a resident of Illinois.

150. Pathway invested in Dellano, a Delaware corporation that does business as Quick Cash in New Mexico.

151. The co-conspirators used Renwel, Pathway, and Blue Financial to obscure Jim's ownership interest in Dellano and Quick Cash, enabling them to perpetrate their fraudulent scheme against Mark.

152. The association-in-fact among the co-conspirators possesses an identifiable chain of command, with Jim as the king pin.

153. Jim agreed to, conducted, and participated in the above enterprises' affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Mark.

154. Pursuant to, and in furtherance of this fraudulent scheme, Jim committed multiple related acts of mail and wire fraud and theft of trade secrets, constituting a pattern of racketeering activity under 18 U.S.C. § 1961(5).

155. As a direct and proximate result of Jim's racketeering activities and in violation of 18 U.S.C. § 1962(c), Mark has been injured in his business and property because his businesses American and B&B have diminished in value, and they have been unable to make as much profit as they otherwise should have.

WHEREFORE, Mark Bartlett requests judgment against Jim Bartlett for:

(a) compensatory damages in an amount in excess of $1,200,000 for Jim's wrongdoing;

(b) treble damages as a result of Defendants' unlawful racketeering activity, pursuant to 18 USC § 1964(c);

(c) costs and fees incurred in this action, including reasonable attorneys' fees, pursuant to 18 USC § 1964(c); and

(d) other such relief as this Court deems just and equitable.

## COUNT II: RICO § 1962(c) – DENISE BARTLETT

156. Paragraphs 1 – 155 are incorporated by reference.

157. This Count is against Defendant Denise Bartlett.

158. Denise agreed to, conducted, and participated in the above enterprises' affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Mark.

159. Pursuant to, and in furtherance of this fraudulent scheme, Denise committed multiple related acts of mail and wire fraud, constituting a pattern of racketeering activity under 18 U.S.C. § 1961(5).

160. As a direct and proximate result of Denise's racketeering activities and in violation of 18 U.S.C. § 1962(c), Mark has been injured in his business and property because his businesses American and B&B have diminished in value, and they have been unable to make as much profit as they otherwise should have.

WHEREFORE, Mark Bartlett requests judgment against Denise Bartlett for:

(a) compensatory damages in an amount in excess of $1,200,000 for Denise's wrongdoing;

(b) treble damages as a result of Defendants' unlawful racketeering activity pursuant to 18 USC § 1964(c);

(c) costs and fees incurred in this action, including reasonable attorneys' fees, pursuant to 18 USC § 1964(c); and

(d) other such relief as this Court deems just and equitable.

### COUNT III: RICO § 1962(c) – EVAN BARTLETT

161. Paragraphs 1 – 160 are incorporated by reference.

162. This Count is against Defendant Evan Bartlett.

163. Evan agreed to, conducted, and participated in the above enterprises' affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Mark.

164. Pursuant to, and in furtherance of this fraudulent scheme, Evan committed multiple related acts of mail and wire fraud, constituting a pattern of racketeering activity under 18 U.S.C. § 1961(5).

165. As a direct and proximate result of Evan's racketeering activities and in violation of 18 U.S.C. § 1962(c), Mark has been injured in his business and property because his American and B&B businesses have diminished in value, and they have been unable to make as much profit as they otherwise should have.

WHEREFORE, Mark Bartlett requests judgment against Evan Bartlett for:

(a) compensatory damages in an amount in excess of $1,200,000 for Evan's wrongdoing;

(b) treble damages as a result of Defendants' unlawful racketeering activity pursuant to 18 USC § 1964(c);

(c) costs and fees incurred in this action, including reasonable attorneys' fees, pursuant to 18 USC § 1964(c); and

(d) other such relief as this Court deems just and equitable.

## COUNT IV: RICO § 1962(c) – ANOOSH MOTAMEDI

166. Paragraphs 1 – 165 are incorporated by reference.

167. This Count is against Defendant Anoosh Motamedi.

168. Anoosh agreed to, conducted, and participated in the above enterprises' affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Mark.

169. Pursuant to, and in furtherance of this fraudulent scheme, Anoosh committed multiple related acts of mail and wire fraud and theft of trade secrets, constituting a pattern of racketeering activity under 18 U.S.C. § 1961(5).

170. As a direct and proximate result of Anoosh's racketeering activities and in violation of 18 U.S.C. § 1962(c), Mark has been injured in his business and property because his American and B&B businesses have diminished in value, and they have been unable to make as much profit as they otherwise should have.

WHEREFORE, Mark Bartlett requests judgment against Anoosh Motamedi for:

(a) compensatory damages in an amount in excess of $1,200,000 for Anoosh's wrongdoing;

(b) treble damages as a result of Defendants' unlawful racketeering activity pursuant to 18 USC § 1964(c);

(c) costs and fees incurred in this action, including reasonable attorneys' fees, pursuant to 18 USC § 1964(c); and

(d) other such relief as this Court deems just and equitable.

### COUNT IV: RICO § 1962(c) – Mark Keenan

171. Paragraphs 1 – 170 are incorporated by reference.

172. This Count is against Defendant Mark Keenan.

173. Keenan agreed to, conducted, and participated in the above enterprises' affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Mark.

174. Pursuant to, and in furtherance of this fraudulent scheme, Keenan committed multiple related acts of theft of trade secrets, constituting a pattern of racketeering activity under 18 U.S.C. § 1961(5).

175. As a direct and proximate result of Keenan's racketeering activities and in violation of 18 U.S.C. § 1962(c), Mark has been injured in his business and property because his American and B&B businesses have diminished in value, and they have been unable to make as much profit as they otherwise should have.

WHEREFORE, Mark Bartlett requests judgment against Mark Keenan for:

(a) compensatory damages in an amount in excess of $1,200,000 for Keenan's wrongdoing;

(b) treble damages as a result of Defendants' unlawful racketeering activity pursuant to 18 USC § 1964(c);

(c) costs and fees incurred in this action, including reasonable attorneys' fees, pursuant to 18 USC § 1964(c); and

(d) other such relief as this Court deems just and equitable.

MARK BARTLETT

By: /s/ Steven N. Malitz
    One of his attorneys

Steven N. Malitz
Christopher S. Naveja
Joseph L. Hoolihan
Arnstein & Lehr LLP
Attorney for Plaintiff
120 South Riverside Plaza, Suite 1200
Chicago, Illinois 60606

113282390.4