UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARK BARTLETT,

    Plaintiff,

  v.

JAMES BARTLETT, DENISE BARTLETT,
EVAN BARTLETT, ANOOSH MOTAMEDI,
and MARK KEENAN,

    Defendants.

No. 16 CV 6595

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Mark Bartlett and his brother James Bartlett jointly own cash-lending stores. Mark is suing James—along with James's wife, son, and two employees—for allegedly setting up rival stores and siphoning business and resources away from the brothers' co-owned stores. [1].[1] James now moves to disqualify Mark's counsel, Arnstein & Lehr LLP (including lead counsel Steven Malitz), because the firm previously represented the brothers' cash-lending businesses in litigation with third parties and did estate planning for James and his wife. For the following reasons, the motion to disqualify is denied.

**I.    Legal Standards**

Local Rule 83.50 incorporates ABA Model Rule of Professional Conduct 1.9 on duties to former clients. Rule 1.9(a) provides that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the

---

[1] Bracketed numbers refer to entries on the district court docket.

same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." In considering motions to disqualify, courts must balance two important considerations: "the sacrosanct privacy of the attorney-client relationship (and the professional integrity implicated by that relationship) and the prerogative of a party to proceed with counsel of its choice." *Schiessle v. Stephens*, 717 F.2d 417, 419–20 (7th Cir. 1983). Although courts have a duty to safeguard the attorney-client relationship, "it must also be recognized that disqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Cromley v. Bd. of Educ. of Lockport Twp. High Sch. Dist. 205*, 17 F.3d 1059, 1066 (7th Cir. 1994). Motions to disqualify counsel are typically disfavored because "they can be misused as techniques of harassment" and they "depriv[e] a party of representation of their own choosing," but "there obviously are situations where they are both legitimate and necessary." *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721–22 (7th Cir. 1982). The moving party "bears a heavy burden of proving facts required for disqualification." *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 794 (2d Cir. 1983).

The standard for disqualification of an attorney who undertakes litigation against a former client is the so-called "substantial relationship" test. *LaSalle Nat'l Bank v. Lake Cty.*, 703 F.2d 252, 255 (7th Cir. 1983). The test has three steps: "First, the trial judge must make a factual reconstruction of the scope of the prior

legal representation. Second, it must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters. Third, it must be determined whether that information is relevant to the issues raised in the litigation pending against the former client." *Id*. at 255–56. Matters are substantially related "if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." ABA Model Rules Prof'l Conduct § 1.9 cmt. 3; *see Analytica, Inc. v. NPD Res., Inc.*, 708 F.2d 1263, 1266 (7th Cir. 1983). If a substantial relationship exists, it is presumed that the attorney received confidential information during the prior representation. *LaSalle Nat'l*, 703 F.2d at 257. Although the presumption is rebuttable, "[a] very strict standard of proof must be applied to the rebuttal of this presumption, however; and any doubts as to the existence of an asserted conflict of interest must be resolved in favor of disqualification." *Id*.

## II. Background

Mark Bartlett and his brother James Bartlett jointly own American Cash Loans, LLC, and B & B Investment Group, Inc. As relevant here, the companies operate four cash-lending stores in New Mexico, which are allegedly managed by James. In 2011, the brothers hired Arnstein & Lehr LLP to represent these companies, another Bartlett business, and Mark individually in two Illinois state court breach of contract actions involving third parties. Around this time, James also hired Arnstein & Lehr LLP for estate-planning work for him and his wife,

3

Denise Bartlett. Steven Malitz was the originating partner for both matters, but his partner Jay Tarshis handled James's estate-planning work in 2011 and 2012. Through 2014, Tarshis also performed some discrete transactional work for two other business entities owned by James.

In early 2015, Mark—represented by Arnstein & Lehr LLP—brought suit against James in Florida state court, alleging that James breached the brothers' business agreement and his fiduciary duties by failing to transfer funds from the cash-lending stores to Mark. James filed a motion to disqualify Arnstein & Lehr as Mark's counsel and requested that the firm return his estate planning file materials. Mark substituted in new counsel before the motion to disqualify was decided. Arnstein & Lehr returned James's file, along with a letter from its general counsel stating that the firm would not perform any additional services for James. In 2015, using other counsel, Mark asserted similar claims against James in New Mexico state court (in two consolidated cases). The Florida court stayed proceedings pending completion of the New Mexico litigation and then dismissed the case without prejudice. The New Mexico litigation remains pending.

In 2016, Mark brought suit against James here in federal court, asserting that James, his wife Denise, his son Evan, and employees Anoosh Motamedi and Mark Keenan engaged in a racketeering scheme in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961. Arnstein & Lehr, with Malitz as lead counsel, represent Mark in the current RICO action against James.

James moves to disqualify Malitz and Arnstein & Lehr, asserting that the firm has a conflict of interest because James is a former client.

III. Analysis

A. Prior Litigation Matters

In 2011, Steven Malitz sent an engagement letter and retainer agreement from Arnstein & Lehr to James and Mark Bartlett. [8-3]. The firm agreed to represent a few Bartlett businesses (American Cash Loans, LLC, B & B Investment Group Inc., America's Cash Advance Store, Inc., and OPM Enterprises, Inc.) in two pending lawsuits in the Circuit Court of Cook County: *OPM Enterprises, Inc. v. Affinity Credit Services, Inc.*, Case No. 09 CH 00521, and *Michael D'Ambrose v. American Cash Loans, LLC et al.*, Case No. 09 L 011858. The letter also stated that the firm would represent Mark, who was named individually in the *D'Ambrose* action. [8-3] at 1. The parties argue over whether James was a client of Arnstein & Lehr for either litigation matter. Although he was not a named party in either suit, and the letter stated that the firm was only representing the Bartletts' businesses and Mark individually, James signed the letter "individually and on behalf of" the businesses. [8-3] at 3. Arnstein & Lehr argues that this was only meant to obligate James to pay for attorney fees if the businesses did not, but there is no language in the letter to that effect. At the end of the day, even if James were not represented by Arnstein & Lehr as a named party, as a co-owner of businesses that necessarily act through people, he would expect to have a confidential relationship with the attorneys representing the businesses.

In *OPM Enterprises, Inc. v. Affinity Credit Services, Inc.*, Bartlett-owned OPM Enterprises, Inc. sued a third party in 2009 for allegedly failing to make payments pursuant to a consulting agreement. *See* [14-2] at 21–29. James does not dispute that Malitz's point of contact for the case was Mark, who was principal of OPM, and the case was resolved in 2011. [14-2] ¶¶ 19, 21. In *Michael D'Ambrose v. American Cash Loans, LLC et al.*, a third-party sued Bartlett-owned businesses American Cash Loans, LLC, B & B Investment Group, Inc., and America's Cash Advance Store, Inc., in 2009 for allegedly failing to make payments pursuant to investment agreements entered into in 2003. An unjust enrichment claim was also brought against Mark for allegedly failing to disburse proceeds from a partnership dissolved in 2008. *See* [14-2] at 8–20. James also does not dispute that Mark was the firm's point of contact in the *D'Ambrose* case and that it was dismissed in 2011. [14-2] ¶¶ 9, 14.

James has made no argument that these prior litigation matters are substantially related to Mark's current RICO suit, although it is his burden to establish a substantial relationship. Two Bartlett businesses in the *D'Ambrose* action—American Cash Loans, LLC, and B & B Investment Group, Inc.—are mentioned in the RICO complaint as jointly-owned businesses from which James and the other defendants allegedly siphoned off business and resources. But James does not argue that any confidential information from these prior actions would be relevant to the issues raised in this RICO action several years later. The prior

6

litigation matters are not substantially related to this RICO action, and therefore the firm is not conflicted from representing Mark on that basis.

### B. Estate Planning and Transactional Work

James largely focuses on estate planning work by Arnstein & Lehr, arguing that the firm's work included review of his assets and business ownership. In 2011, James engaged the firm to assist with estate planning for him and his wife. Malitz sent James an engagement letter and retainer agreement stating that the scope of the representation was "to review your existing asset protection structure, offer suggestions for any revisions or additions, and draft certain documents to implement our suggestions, with your prior approval." [8-4] at 1. The estate planning work was done by another Arnstein & Lehr partner, Jay Tarshis, but Malitz remained the originating/billing partner. [8-4] at 1; [14-2] ¶¶ 22–23; [14-3] ¶ 4. Tarshis worked on James's estate plan from 2011 to 2012. From 2012 through 2014, Tarshis performed some "corporate maintenance" for two of James's other businesses (AITF Investments and Infinite Leads, LLC). [14-2] ¶¶ 24, 29–30; [14-3] ¶¶ 4–6, 11–12.

Estate planning issues do not, on their face, appear to be relevant to the alleged racketeering scheme. However, James asserts that Arnstein & Lehr's estate planning work continued nearly until 2015 and included review of all his assets and business ownership. He argues that this information was kept by Arnstein & Lehr, along with an analysis of the entities and potential changes to their corporate structure, until he requested the return of his file in 2015. Arnstein & Lehr, in turn, described its estate planning work much more narrowly, maintaining that Malitz

7

was never involved with the estate planning, that Tarshis merely updated an existing estate plan in 2011 and 2012, and that Tarshis thereafter performed limited transactional work for two other business entities owned by James, which are not at issue in the RICO action. Faced with these competing versions of the scope of the transactional matters performed for James, I accepted James's offer to submit his Arnstein & Lehr file for in camera review.

A review of the file shows that the scope of Arnstein & Lehr's estate planning work was more involved than the firm suggested, but its work was not as extensive or current as James argues. The estate planning work occurred largely in 2011 through 2012 and was performed by Tarshis. For estate planning purposes, Arnstein & Lehr had access to information regarding James and Denise Bartlett's assets and business ownership, including James's co-ownership of American Cash Loans, LLC, and B & B Investment Group, Inc. (the entities owning the New Mexico cash stores at issue in the RICO action). Tarshis also performed some transactional work for other business entities owned by James (and which are not at issue in the RICO action). According to Tarshis, the last billing entry for that work was in May 2014. [14-3] ¶ 12. Tarshis also declared that he performed no work for brothers' jointly-owned businesses, or the alleged new rival business entities. [14-3] ¶¶ 14–15. Similarly, James does not contend that Tarshis performed any transactional work for American Cash Loans, LLC, or B & B Investment Group, Inc., or for any other corporate entity mentioned in Mark's RICO complaint. Arnstein & Lehr's termination of the engagement was not formalized until 2015,

8

when the firm's general counsel sent James' counsel the letter when returning his file. [8-5].

It is reasonable to infer that confidential information relating to James and Denise Bartlett's personal finances, assets, and business ownership as of 2012 passed to Arnstein & Lehr. The evidence need not establish that Arnstein & Lehr actually received confidential information—instead, James only need establish the scope of the legal representation and a reasonable inference that the firm could have received confidential information under it. *See Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Labs., Inc.*, 607 F.2d 186, 189 (7th Cir. 1979) ("The evidence need only establish the scope of the legal representation and not the actual receipt of the allegedly relevant confidential information."). Although Malitz disclaims involvement in the estate planning and transactional matters as anything other than the originating partner, actual receipt of confidential information by other members of the firm need not be shown if the prior and current representations are substantially related matters. *See id*. at 189, 192; *LaSalle Nat'l*, 703 F.2d at 257. Moreover, James's file includes communications with Tarshis, copying Malitz—Malitz cannot rebut the presumption that he and the firm received confidential information during the course of James's estate planning work.

The remaining question, then, is whether confidential information about James and Denise Bartlett's assets and business ownership from 2011 and 2012 is relevant to the issues in this RICO action. (The mere fact of James's co-ownership of American Cash Loans, LLC, and B & B Investment Group, Inc. is not confidential

because that information was already known to others.) "Relevance must be gauged by the violations alleged in the complaint and an assessment of the evidence useful in establishing those allegations." *Westinghouse Electric Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 226 (7th Cir. 1978). Mark alleges that beginning in 2014, James (with the help of his wife Denise, son Evan, and employee Anoosh Motamedi) organized a company named Dellano LLC to operate a new loan business called AAA Quick Cash Advance, to be managed by Motamedi and another employee, Mark Keenan. According to Mark Bartlett, the defendants began directing customers, money, and resources away from the New Mexico stores owned by the brothers' jointly owned companies to Dellano and AAA Quick Cash Advance. He alleges that in 2014, Denise, Evan, and Anoosh reinstated Dellano as a company, and that they also incorporated Blue Financial, Inc. (with Motamedi and the Denise E. Bartlett Revocable Trust 1-20-2007 as shareholders) and The Pathway Group, Inc. (with Denise and Evan as shareholders) to jointly own Dellano. He asserts that another company, Renwel Financial, Inc. was solely owned by Denise and provided seed funding to Blue Financial and The Pathway Group in order to capitalize Dellano. *See generally* [1].

James, however, does not explain how information about James and Denise's assets in 2011 and 2012 is materially relevant to any issue in the RICO action—namely, whether the defendants set up a racketeering scheme in 2014 by forming new business entities and siphoning business to these newly-formed entities. *See* ABA Model Rules Prof'l Conduct § 1.9 cmt. 3 (matters are substantially related "if

10

they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter"); *see, e.g., Bayshore Ford Truck Sales, Inc. v. Ford Motor Co.*, 380 F.3d 1331, 1340 n.10 (11th Cir. 2004) (affirming denial of motion for disqualification where movant did not argue that knowledge of business ownership and estate planning matters would have given attorney insight into breach of contract claim); *alfaCTP Sys., Inc. v. Nierman*, No. 15-CV-9338, 2016 WL 687281, at *5 n.9 (N.D. Ill. Feb. 19, 2016) (although there was a reasonable inference that defendant shared confidences with firm relating to his estate planning and real estate investments, such information was not reasonably related to action against defendant alleging fraud, breach of contract, and breach of fiduciary duty arising from purported misuse of company funds). He does not assert, for example, that any Arnstein & Lehr attorney assisted James with transactional work related to the jointly-owned entities or assisted him to form any of the rival business entities alleged in the RICO suit. James also does not assert that any Arnstein & Lehr attorney would be called as a witness or invoke the witness-advocate rule set forth in Model Rule 3.7. James's generalized argument that the firm's exposure to information about his assets creates a conflict of interest does not explain how that information is relevant to Mark's RICO allegations. James has not met his heavy burden of demonstrating a substantial relationship between the current and former

representations, and of justifying the drastic step to disqualify Mark's chosen counsel.

C. Other Litigation

James suggests, however, that the specificity of Mark's RICO allegations could only have come from knowledge gleaned from James's estate planning work. In response, Arnstein & Lehr contends that Mark caught wind of the alleged racketeering scheme during discovery in the New Mexico litigation, when Motamedi disclosed the existence of the rival business during his deposition. The firm states that it then obtained further information to support its RICO allegations from various secretary of state websites and other defendants' depositions during the New Mexico litigation. In reply, however, James pokes holes in the credibility of this assertion by pointing out that Mark asserted a similar state-law RICO counterclaim against James and Motamedi in early October 2015. [12-6] at 11–13. The depositions of Motamedi and Denise Bartlett did not occur until mid-November 2015, several weeks later. [16-2]. Other filings in the New Mexico litigation indicate that as early as August 2015, Mark had filed a third-amended complaint alleging that James and Motamedi had opened a rival business. [14-5] at 5. The filing also indicates that Mark, in fact, learned before the depositions that Motamedi had opened a rival business, and the depositions then provided additional specificity to the allegations. [14-5] at 5–6.

Arnstein & Lehr does not provide an entirely coherent explanation for how Mark discovered that James and Motamedi were allegedly setting up rival stores. But that does not mean that such information came from Arnstein & Lehr's estate

planning work for James and Denise. Indeed, James does not contest Tarshis's declaration that Tarshis never performed any work for the brothers' jointly-owned businesses or for the business entities alleged to be rival stores opened by James and the other defendants two years later. Nothing in James's estate planning file suggests that the scope of Tarshis's work extended to any of these entities, or that his review of James and Denise Bartlett's assets continued beyond 2012. Given the limited scope of the estate planning work, it is not reasonable to infer that RICO allegations relating to Motamedi and rival businesses could have originated from Arnstein & Lehr's representation of James.

James also argues that Arnstein & Lehr essentially conceded a conflict of interest when Mark substituted in new counsel in the Florida litigation after James sought to disqualify the firm. But the motion for disqualification was never decided by the Florida court. It is too speculative to conclude, without more, that the firm conceded a conflict of interest, and speculation is an inappropriate basis for disqualification.[2]

---

[2] James also argues in his reply brief (where new arguments ordinarily may not be raised) that the court should apply the disqualification test for current client conflicts under Model Rule 1.7(a), which prohibits representation of one client directly adverse to another, because Arnstein & Lehr did not expressly end its engagement for James until after it filed the Florida litigation on Mark's behalf. Rule 1.7 on concurrent representations does not apply because James admits he was a former client at the time this suit was filed. Arnstein & Lehr possibly faced disqualification under Rule 1.7 in the Florida litigation, and the firm's conduct in agreeing to represent Mark against James in that case is not above reproach. But the timing and circumstances of this case are different.

**D.     Impropriety**

Relying on *O'Malley v. Novoselsky*, No. 10 C 8200, 2011 WL 2470325, at *2 (N.D. Ill. June 14, 2011), which states that "a court may disqualify an attorney for failing to avoid even the appearance of impropriety," James asserts that Arnstein & Lehr should be disqualified from representing Mark in order to avoid the appearance of impropriety. *O'Malley*, however, was quoting *International Business Machines Corp. v. Levin*, 579 F.2d 271, 283 (3d Cir. 1978), which relied on the ABA Model Code of Professional Responsibility. The Model Code has since been replaced by the ABA Model Rules of Professional Conduct. *Waters v. Kemp*, 845 F.2d 260, 265 (11th Cir. 1988). "Under the Model Rules, the appearance of impropriety is not a ground for disqualifying a lawyer from representing a party to a lawsuit." *Id.* James's general assertion of impropriety is not a sufficient basis to disqualify Arnstein & Lehr.

James has not met the heavy burden of establishing a substantial relationship between Arnstein & Lehr's estate planning work for him and its current representation of Mark in the RICO action. In absence of that showing, the motion to disqualify is denied because disqualification is a "drastic measure which courts should hesitate to impose except when absolutely necessary." *Cromley*, 17 F.3d at 1066. But the motion to disqualify was not frivolous and its denial should not be viewed as an endorsement of Arnstein & Lehr's conduct.

## IV. Conclusion

James Bartlett's motion to disqualify plaintiff's counsel, [8], is denied.

ENTER:

*/s/ Manish S. Shah*

Manish S. Shah
United States District Judge

Date: 12/20/2016